IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| CYNTHIA MARIE MURRAY, ) | Case No. 08-40854 |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | |
| RUSSELL J. KRUSE and BETH A. KRUSE, ) | Adversary No. 08-04198 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| CYNTHIA MARIE MURRAY, ) | |
| ) | |
| Defendant. ) | |

**<u>MEMORANDUM OPINION</u>**

Russell J. and Beth A. Kruse ("Creditors" or "Plaintiffs") filed a complaint seeking a determination that debtor Cynthia Marie Murray ("Debtor" or "Defendant") be denied a discharge for alleged debts owed to Plaintiffs pursuant to 11 U.S.C. § 523(a)(2), (4), (6) & (10), which allegations Debtor denied. This Court held a trial on the issues and issued a directed verdict denying the complaint except for the allegation that Debtor embezzled $5,500 pursuant to § 523(a)(4), which the Court took under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, the Court finds that the alleged indebtedness owed by Debtor Cynthia Marie Murray to Plaintiffs is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

## I.  FACTUAL BACKGROUND

On May 28, 2004, Creditors entered into a contract with Murray Home Building, signed by Jim Murray individually, for home construction.  Plaintiffs' Ex. 8.  The contract set forth the total price on the house at $310,000 with terms of 10% down, monthly draws and a completion date of December 31, 2004.  Debtor testified that she was the office manager or secretary for the company and that she typed the contract.  Creditors obtained a $200,000 loan for construction of the home.  Pl. Ex. 11.  On June 5, 2004, Creditors paid $5,000 by a check made payable to Debtor personally, which she endorsed and deposited into the Precision Home Theater, Inc.[1] account. Pl. Ex. 9.  This was done at the instruction of Jim Murray.  On July 2, 2004, a draw request was made to the State Bank of Missouri for $26,000 for up-front costs from the Kruses' loan amount.  Pl. Ex. 12.  That amount was paid by money order to Debtor and deposited into her and her husband's personal joint account on July 6.  Pl. Ex. 14.  Debtor testified that this was done per her husband's instruction also but that she was not involved in that decision and that she does not know how those funds were spent.  Also on July 6, $20,000 was transferred from that personal account to the account of Precision Home Automation and Technologies and $500 was transferred to Murray Home Builders to open an account for the Kruse house construction expenses.  Pl. Ex. 14.

Jim Murray testified that expenses for the Kruse home were paid from both accounts and that he had the primary responsibility for the checks[2].  Debtor was listed as a signatory on the

---

[1] Jim Murray testified that Precision Home Theater, Inc. was now operating as Precision Home Automation and Technologies and was also doing business as Murray Home Builders in 2004.

[2] It is noted that Debtor wrote only eight checks from the corporate account.

corporate account. Six additional draw requests were made from the Kruse loan and Debtor testified that she prepared some of those forms at the direction of her husband. There was also testimony from several suppliers. Mr. Dittmer from Green Ready Mix testified that the account was in Debtor's name but that Jim Murray was authorized to charge to the account. He also testified that the account was opened when the construction company was started. Mr. Siebert from MFA Lumberyard testified that the account was in both Debtor and her husband's names and that they went to state court to seek a judgment against Mr. Murray. Mr. Benedict of Benedict Builders testified that he started doing work for the Murrays in the mid-90s and that on the Kruse home project he took direction from and was paid by Jim Murray. The vice-president at the State Bank of Missouri, the bank where the Creditors obtained their loan, testified that a standard draw form was used and that they were usually brought in by Jim Murray. In 2004, Murray Home Builders was also building a speculation home and a personal home for Debtor. Debtor and her husband's joint tax returns for 2003 and 2004 show a division of loss from the corporation.

Jim Murray testified that the basement walls were put in for the Kruses' home in August 2004, the first floor was built in the Fall of 2004 and the second floor was built after Thanksgiving of 2004. In October 2004, Mr. Kruse delivered lien waivers to Debtor which she testified that she gave to her husband. He testified that Murray Home Builders did no more work on his home construction project after December 2004 and that he hired a subcontractor to finish the roof and paid them directly with another loan he obtained from State Street Bank in Illinois. Creditors then decided to sell the incomplete home and listed it for $75,000 and received $60,000.

## II. PROCEDURAL BACKGROUND

Debtor filed a prior bankruptcy case which was dismissed for failure to comply with discovery orders on March 23, 2007. Subsequently, Debtor filed this Chapter 7 bankruptcy petition and Creditors filed an adversary proceeding seeking non-dischargeability of a debt owed to them by Debtor pursuant to § 523(a)(4). The Court held a trial on the issues and issued a partial directed verdict at its conclusion. The Court took under advisement the non-dischargeability of $5,500 from the $26,000 draw that was deposited in Debtor's personal account and not transferred to a corporate account.

Following the trial, Creditors filed a Motion to Amend Pleadings to Conform to Evidence and Motion to Reconsider Order Granting Partial Directed Verdict[3] in which they request that the Court allow the Complaint to be amended to include defalcation and larceny claims with regard to the $5,000 check dated June 5, 2004, and of $25,500 of the $26,000 check dated July 2, 2004. Creditors also requested that the Court partially set aside and reconsider its partial directed verdict issued after the trial held on February 6, 2009, and docketed on February 11, 2009, with respect to the $5,000 check and to $20,000 of the $26,000 check. Debtor filed an Answer to the Motion requesting that the Court deny Creditors' Motion.[4]

### A. Motion to Amend

A court should freely give leave to a party to amend its pleadings when justice so requires but may deny such motion when it would unduly prejudice the non-moving party.

---

[3] The Court will consider this a motion to alter or amend under Rule 59(e) as there is technically no such motion under the Rules as a motion for reconsideration.

[4] The Court will deny Debtor's Answer and Motion to Strike as moot because although the Motion to Amend was granted, as set forth below, the Court is denying the underlying claims so Debtor is not prejudiced.

4

*McAninch v. Wintermute*, 491 F.3d 759, 766-67 (8th Cir. 2007)[5]. The inclusion of a claim based on facts already known or available to both sides does not prejudice the non-moving party. *Buder v. Merril Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 694 (8th Cir. 1991). In this case, the new claims of larceny and defalcation are based on the same set of facts as the original claim of embezzlement. Debtor makes no persuasive argument that she would be prejudiced by allowing the amendment. Because of this, the Court finds that Debtor will not be prejudiced by allowing Plaintiffs to amend the Complaint to add larceny and defalcation under §523(a)(4) and the Court will grant the Motion to Amend to allow the Complaint to include claims of defalcation and larceny of the $5,000 check dated June 5, 2004, and of $25,500 of the $26,000 check dated July 2, 2004.

### B. Motion to Reconsider

Rule 59(e) allows the bankruptcy court to alter or amend a judgment after its entry or, in limited circumstances, reconsider a substantive aspect of a previously issued determination. *NationsBank v. Blier (In re Creative Goldsmiths),* 178 B.R. 87, 90-91 (Bankr. D. Md. 1995). One of the primary purposes of a Rule 59(e) motion is to permit the correction of any manifest errors of law or misapprehension of fact. *In re DEF Investments, Inc.,* 186 B.R. 671, 680 (Bankr. D. Minn. 1995). "A manifest error of law is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent'." *Elza v. United States of America,* 335 B.R. 654, 657 (E.D. Ky. 2006) *citing Oto v. Metropolitan Life Ins. Co.,* 224 F.3d 601, 606 (7th Cir. 2000). Rules

---

[5] If a plaintiff wishes to amend the complaint pursuant to Rule 15(a) following the entry of judgment, he or she may do so "only with leave of the court after a motion under Rule 59(e) or 60(b) ... has been made and the judgment has been set aside or vacated." *Figgie Int'l Inc. v. Miller,* 966 F.2d 1178, 1179 (7th Cir.1992). However, even though the Court has declined to set aside or vacate its prior judgment, it will grant Creditors' motion to amend since it does not prejudice Debtor in this case and since there is still a portion of the complaint upon which the Court has not entered judgment.

59(e) and 60(b) are not designed to provide an avenue for a disappointed party to relitigate a matter previously decided by the court, or to introduce new evidence, tender new legal theories, or to raise arguments which could have been offered prior to entry of the order. *United States of America v. Metropolitan St. Louis Sewer District,* 440 F.3d 930, 933 (8th Cir. 2006); *Bannister v. Armontrout,* 4 F.3d 1434, 1440 (8th Cir. 1993); *Jones,* 112 B.R. at 977. "Attempts to 'take a second bite at the apple' or pad the record for purposes of appeal are thus beyond the scope of Rules 59 and 60." *DEF Investments,* 186 B.R. at 681. When issues have been carefully analyzed and a judgment has been rendered, only a change in the law or the facts upon which the court's decision was based, will justify reconsideration of a court's previous order. *Id.* Relief afforded by Rule 59 is granted sparingly and is properly viewed as an extraordinary remedy. *See Kieffer v. Riske (In re Kieffer-Mickes, Inc.),* 226 B.R. 204, 210 (B.A.P. 8th Cir. 1998); *Wilson v. Runyon,* 981 F.2d 987, 989 (8th Cir. 1992).

The Court finds that Creditors did not show there were any manifest errors of law or newly discovered evidence which would present the extraordinary circumstances necessary to alter or amend its partial directed verdict. Thus, the Court will deny that portion of Creditors' Motion that requested that the Court partially set aside and reconsider its partial directed verdict, as it relates to the $5,000 check and to $20,000 of the $26,000 check pursuant to the embezzlement claim under §523(a)(4) for the same reasons that follow denying the embezzlement claim with regard to the $5,500 portion of the $26,000 check which the Court took under advisement.

## II. DISCUSSION

### A. Embezzlement

The first cause of action under § 523(a)(4) that the Court will address considers whether Debtor has embezzled property or funds. For the purposes of § 523(a)(4), embezzlement is the "fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661, 662 (8th Cir.1988). A plaintiff must establish by a preponderance of the evidence that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used. *Id.* To prevail, Creditors must prove that Debtor appropriated the funds at issue for her own benefit by fraudulent intent or deceit; deposited the funds into an account accessible only to Debtor; and that Debtor was not lawfully entitled to the use of those funds for the purposes for which they were in fact used. *In re Beasley*, 62 B.R. 653, 655 (W.D. Mo. 1986). The debtor's fraudulent intent may often be shown by circumstantial evidence. *In re Sedlacek,* 327 B.R. 872, 880-81 (Bankr. E.D. Tenn. 2005). The Court rejects the embezzlement claims because the evidence fails to establish either that it was the Debtor that appropriated the funds or that any conduct of Debtor was fraudulent. The Court also rejects Creditors' suggestion that, assuming they were defrauded by acts of Debtor's husband, that she is responsible for those acts.

As to the first element, the Court finds that Creditors have not proven that Debtor appropriated the funds at issue by fraudulent intent on the part of Debtor. "The inquiry of dischargeability under § 523(a)(4) focuses on the acts *of the debtor him- or herself."* In re *Porter*, 539 F.3d 889, 894 (8th Cir. 2008); *In re Scott*, 403 B.R. 25, 35 (Bankr. D. Minn. 2009). Creditors assert that Debtor embezzled the $5,000 check and $25,500 of the $26,000 check[6].

---

[6]Although the Court is not reconsidering its ruling at trial on those amounts, it will discuss them in conjunction with the $5,500 that is under advisement since the analysis is the same.

7

The evidence shows that the $5,000 check was deposited into the company's bank account. Regarding the $25,500 of the $26,000 check, Creditors assert that $20,000 of that amount was first deposited into Debtor's personal account and then transferred into the corporate account, but not used on their house building job and that the remaining $5,500 was deposited and left in Debtor's personal account.

The evidence clearly shows, and Creditors do not dispute, that the $20,000 amount was deposited into the corporate account from Debtor's personal account. Thus, those funds were placed into the account of the company that was building Creditors' house and there is no evidence that Debtor controlled the disposition of these funds or had the requisite fraudulent intent to appropriate those funds. Although Creditors argue that the money was not placed into a special account for their project, the contract does not specify that funds be placed into any type of special account.

As to the remaining $5,500, the Court finds that Creditors have not met their burden to prove the requisite fraudulent intent to appropriate the funds by Debtor. Creditors did not introduce any evidence that Debtor controlled the disposition of funds nor that she directed any funds to be paid from the corporate account or their personal joint account for specific projects such as her personal building projects. Debtor did not manage the building projects schedules, arrange for the materials and supplies to be ordered, nor did she direct the payment of the funds as to who got paid and when. Debtor testified, and the evidence shows, that her participation in the corporation and the Creditors' project was only ministerial and that she would prepare draw requests and deposit slips at the direction of her husband and based on information supplied by him. None of these actions provides the necessary proof that Debtor intended to fraudulently appropriate funds from Creditors.

8

Creditors also assert that even if Debtor's husband is the one primarily responsible for the misappropriation that Debtor was engaged in a conspiracy with her husband to embezzle the funds. To establish a cause of action for civil conspiracy, a plaintiff must plead facts that support each element, which are: "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful overt acts, and (5) resulting damages." *Mackey v. Mackey,* 914 S.W.2d 48, 50 (Mo. App. 1996). "The essence of a civil conspiracy is an unlawful act agreed upon by two or more persons." *Id.* Plaintiff neither pled nor introduced any evidence to prove that Debtor and her husband had a "meeting of the minds" on a course of action to embezzle Plaintiff's funds. There is no evidence of record to support the finding of a conspiracy between Debtor and her husband to embezzle Creditors' funds.

Creditors also assert that Debtor's husband's alleged fraud can be imputed to Debtor because they were partners in a theft venture. Creditors base this argument on the Supreme Court case *Strang v. Bradner*, 114 U.S. 555 (1885) and also cite *In re Miller*, 276 F.3d 424, 429 (8th Cir. 2002). However, *Strang* specifically relied on the common law of agency and partnership to impute the fraud of an innocent debtor's business partner to that debtor and so render his debt nondischargeable. The *Miller* court actually declined to extend an exception from discharge to the joint liability that § 20(a) of the Securities Exchange Act of 1934 imposes on an innocent supervisor-broker for the fraud of the broker's employee. 276 F.3d at 429. That case declined to extend *Strang* beyond its basis in agency law.

Missouri law defines a partnership as "an association of two or more persons to carry on as co-owners [of] a business for profit." *Norber v. Marcotte*,134 S.W.3d 651, 658 (Mo.Ct. App. 2004); *Fischer v. Brancato,* 937 S.W.2d 379, 382 (Mo. Ct. App. 1996). "Partnership is defined

9

by the courts as a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions." *Id.* The primary criteria in determining the creation of a partnership is the intention of the parties. *Id.*

There has been no evidence presented that Debtor and her husband are business partners in any legal sense. As noted, Debtor performed secretarial tasks at the direction of her husband and was not involved in making corporate decisions. The evidence shows that her official capacity with the corporation was as office manager and that she was not an officer, director or shareholder of the corporation.

Creditors argue that Debtor's 2003 and 2004 tax returns divided the corporate losses equally between her and her husband and lends itself to the conclusion that Debtor had an interest or was a shareholder in the corporation or that the business was operated as a partnership. However, upon review of those two tax returns, the Court notes that the loss was reported for Precision Home Automation & Technology as an S Corporation. Pl. Ex. 36.[7] In both 2003 and 2004, a Schedule K was filed only in Debtor's husband's name and listed him as a 70% shareholder of the corporation and claimed the loss as his ordinary loss from trade or business activities. Thus, Creditors' argument that Debtor and her husband split the corporation's losses and therefore Debtor had an interest in the corporation, fails. Debtor and her husband merely filed their joint individual income tax returns, and Debtor's husband claimed a business loss as a 70% shareholder of the S corporation. There is no evidence that the loss was

---

[7] Subchapter S of the Internal Revenue Code provides that a small business may choose to have its profits and losses allocated pro rata to its shareholders and reported on their individual income tax returns rather than pay corporate income tax. I.R.C. § 1366(a). Corporations making elections under this subchapter essentially function as "pass-through" entities for tax purposes.

also claimed by Debtor as she was not listed as a shareholder on the Schedule K provided, nor is there evidence that she filed a Schedule K to claim a portion of the loss as a shareholder.

Creditors further allege that Debtor was a fiduciary in her role as "corporate manager" and that her signatory authority on the bank accounts permits this Court to find her liable on those claims. In support they cite *In re Beasley*, 202 B.R. 979 (Bankr. W.D. Mo. 1996). However, the *Beasley* case involved a mother and son that had intertwined their respective companies and were insiders of each company. The mother, to whom her son's fraud was imputed, personally guaranteed his deals and allowed him to routinely act on her behalf and authorized him to act as her agent. 202 B.R. at 984-86. She was also active in the business, a fact which distinguishes her from the Debtor here.

Again, as discussed above, Debtor was not a corporate officer, director or shareholder. She had minimal involvement with the corporation and did not make day-to-day decisions. The fact that she had signatory authority on the corporate account does not establish ownership of the funds or her personal control or liability for the disposition of those funds, merely that she could execute checks on the corporate account. There was no evidence presented that Debtor's husband was acting on her behalf as an agent.

Creditors presented evidence that certain supplier accounts, such as the lumberyard, were in Debtor's name. However, it appears that these accounts were established before the Creditors' project and probably even before her husband's corporation was formed. Debtor did not order the goods or services on the accounts. Creditors' argument that Debtor accepted lien waivers from them likewise does not establish any corporate authority of Debtor as the testimony showed that Debtor was standing in her driveway and Mr. Kruse merely handed her the waivers which she gave to her husband. Further, Creditors' blanket assertion that Debtor knew the

11

money was used for her personal construction projects and for her living expenses is not supported by the evidence. Creditors have submitted draw requests, deposit slips and cancelled checks but none of these shows by a preponderance of the evidence that the funds provided by Creditors were the same funds used for Debtor's personal building projects or expenses. As discussed previously, there is no evidence that Debtor directed the funds to be paid from the corporate account to specific projects or suppliers. None of the evidence presented by Creditors establishes that Debtor was in a position within the corporation to which her husband's alleged fraud can be imputed, or that they were in a conspiracy or partnership.

The second element has also not been met. Creditors must show that Debtor deposited the funds into an account accessible only to Debtor. Instead, the evidence is uncontroverted that both Debtor and her husband had access to their personal joint account and signatory authority on the corporate account. Presumably, the purpose of this element is to establish that only the accused had access to the misappropriated funds and that is clearly not the case here. The evidence instead shows that Debtor's husband had access to both accounts and that he was the one that controlled the funds in the corporate account. As noted, Debtor did not direct the funds to specific uses and she did not decide which suppliers and bills were to be paid.

The third element is that Debtor was not lawfully entitled to the use of those funds for the purposes for which they were in fact used. *In re Beasley*, 62 B.R. at 655. Creditors strongly argue that all of the funds at issue that they paid to Debtor's husband's company were used for Debtor's personal projects and expenses and not on their building project as intended. However, they have not presented persuasive evidence that those funds were in fact not used to pay for work on their project. In fact, Creditor Mr. Kruse testified that he expected Mr. Murray to make a profit on their building project and the Court notes that the $31,000 at issue is exactly 10% of

the $310,000 contract amount for the cost of Creditors' building project. Moreover, as noted above, the contract did not require that the funds be segregated or that draws be used only for specified purposes. It required only that the builder provide a home in exchange for the agreed total price. There was also no proof submitted that would support a finding that Debtor knew the purpose of the payment or that she had any intent to use the funds for a purpose other than that which was intended.

Based on the foregoing, the Court finds that Creditors did not introduce sufficient evidence to meet their burden of proving that Debtor appropriated the funds at issue or that she had the requisite fraudulent intent. Therefore, the second cause of action under § 523(a)(4) fails.

### B. Defalcation in a Fiduciary Capacity

Creditors argued that the debt resulted from a defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. § 523(a)(4)[8]. The Court took under advisement the discharge of $5,500 of the $26,000 check issued on July 2, 2004. As noted above, the Court also granted Creditors' Motion to Amend and will therefore consider the defalcation charge as it relates to the $5,000 check dated June 5, 2004, and of $25,500[9] of the $26,000 check dated July 2, 2004. The Court need not address each individual amount separately because the legal reasoning behind the Court's decision on the underlying claim is the same as to each separate amount.

This cause of action requires fraud or defalcation while acting in a fiduciary capacity. A defalcation is "the misappropriation of funds held by a fiduciary and includes the innocent

---

[8] As noted above, the Court already denied the Complaint regarding $20,500 of the $26,000 check for the same reasons that are set forth for denying the Complaint as to the remaining $5,500 of that check. As previously discussed, the Court denied Creditors' Motion to Alter or Amend its Partial Directed Verdict in that regard.

[9] This amount includes the $5,500 that the Court took under advisement and $20,000 that the Court has allowed Creditors to amend the complaint to include a defalcation and larceny charge under §523(a)(4).

13

default of a fiduciary who fails to account fully for money received." *International Fidelity Ins. Co. v. Herndon (In re Herndon),* 277 B.R. 765, 768 (Bankr. E.D. Ark.2002) (citing *Tudor Oaks Ltd. P'ship v. Cochrane ( In re Cochrane),* 124 F.3d 978, 984 (8th Cir.1997)). The issue of whether a relationship is a fiduciary relationship within the meaning of § 524(a)(4) is a matter of federal law. *See In re Shahrokhi*, 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001)*; Cochrane,* 124 F.3d at 984. According to the Eighth Circuit, the Code's reference to a "fiduciary" applies only to trustees of express trusts, or through a statute or other state rule creating fiduciary status that is "cognizable" in bankruptcy proceedings. *Barclays Am./ Bus. Credit, Inc. v. Long ( In re Long),* 774 F.2d 875, 878 (8th Cir.1985).

Statutory exceptions to discharge are narrowly construed. *Werner v. Hofman*, 5 F.3d 1170, 1172 (8th Cir. 1993). The term "fiduciary" in particular is much more narrowly defined in bankruptcy than at common law. *See Shahrokhi*, 266 B.R. at 707; *see also Schreibman v. Zanetti-Gierke (In re Zanetti-Gierke)*, 212 B.R. 375, 380 (Bankr. D. Kan. 1997) (holding that "[t]he general fiduciary duty of loyalty, good faith, and fair dealing is insufficient to bar discharge of a debt under § 523(a)(4)"). The exception in § 523(a)(4) precluding the discharge of "any debt . . . for fraud or defalcation while acting in a fiduciary capacity" applies *only* to express or technical trusts. *Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir. 1997). "[I]t takes more than a 'merely contractual relationship' to establish the existence of a fiduciary relationship. The parties must declare their intent to create a trust followed by the creation of the trust and a trust res." *Mo-Kan Iron Workers Pension Fund v. Engleman (In re Engleman)*, 271 B.R. 366, 369-70 (Bankr. W.D. Mo. 2001).

In this case, there was not an express trust created between the parties specifying a fiduciary relationship. Creditors allege that Debtor was to hold the funds as a fiduciary and use

them to pay up-front construction costs per the contract she typed. However, there is no evidence that Creditors and Debtor were parties to any contract nor that Debtor was doing any thing more than typing terms into a contract as she was instructed. Even so, the contract to which Debtor's husband's company was a party says no such thing. Additionally, neither party cited to or provided the Court with a Missouri statute or other state rule creating a fiduciary relationship.

In their brief, Creditors intermittently refer to Debtor as the "corporate manager" but there is no evidence that Debtor occupied any position within the company other than that of "office manager." Further, Creditors do not cite to any law that supports their suggestion that a "corporate manager" is a fiduciary and the Court is not aware of any law to that effect. Debtor testified and the evidence indicates that she was the office manager or secretary for the corporation and performed general administrative tasks at the direction of her husband, the owner of the company. Debtor held no officer, director or shareholder position in the corporation and did not control where the funds went or what bills were paid. She did not draft the contract or any letters between the parties but merely typed what she was instructed to by her boss/husband. As discussed above in the embezzlement claim section, there was no law cited by Creditors which would enable the Court to hold Debtor personally liable for the corporate debts, and any conspiracy or partnership charge is not supported by the evidence.

Based on the foregoing, Plaintiffs failed to establish that Debtor was "acting in a fiduciary capacity" as defined by the Bankruptcy Code, and this Court denies the complaint to except such debt from discharge under that section. Accordingly, the Court finds that Debtor is not a fiduciary for purposes of § 523, and the defalcation cause of action under § 523(a)(4) fails.

### C. Larceny

The third cause of action under § 523(a)(4) involves larceny. Larceny is the "fraudulent

and wrongful taking and carrying away of the property of another with the intent to convert the property to the taker's use without the consent of the owner." 4 Collier on Bankruptcy ¶ 523.10[2], at 523-76 (15th ed. rev.); *In re Belfry*, 862 F.2d at 662. The primary difference between larceny and embezzlement involves the initial taking of the property. For larceny, the original taking must be unlawful. *Id.*

There is no evidence in the record that Debtor fraudulently or wrongfully took Creditors' property. Rather, the record demonstrates that Creditors voluntarily gave or entrusted Debtor with the funds from the initial $5,000 check. Further, that the $26,000 draw was personally made out to Debtor was not the result of any act by Debtor. She did not make the request that the draw be made out to her personally. Per the discussion above, there is no evidence that Debtor appropriated the funds at issue or that she had the requisite fraudulent intent to do so. There is also no evidence that, before the funds came into her possession, she had formulated a plan to use them for a purpose other than that for which they were intended. Because of this, the original possession of the funds by Debtor was not unlawful and thus did not amount to larceny as that term is used in § 523(a)(4). Accordingly, the third cause of action under § 523(a)(4) fails.

For all of the above reasons, the Court finds that the alleged indebtedness owed by Debtor Cynthia Marie Murray to Plaintiffs is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

A separate Order will be entered in accordance with Bankruptcy Rule 9021.


Dated: <u>June 22, 2009</u>                           /s/ Dennis R. Dow
                                                              THE HONORABLE DENNIS R. DOW
                                                              UNITED STATES BANKRUPTCY JUDGE

Copies to:
Russell J. Kruse
James H. Worthington